UNITED STATES of America, Plaintiff,

v.

Anthony Ray JEFFERSON, Roosevelt Jefferson, Jr., Ernest Lee Tillis, Defendants.

No. CR89–017–K.

United States District Court,
D. Wyoming.

Sept. 19, 1989.

---

Richard A. Stacy, U.S. Atty., D. Wyoming, and Maynard D. Grant, Sp. Asst. U.S. Atty., D. Wyoming, Cheyenne, Wyo. for plaintiff.

Daniel G. Blythe, Cheyenne, Wyo., for defendant Anthony Jefferson.

Robert W. Schrader, Cheyenne, Wyo., for defendant Roosevelt Jefferson, Jr.

## ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS (WITH FINDINGS)

KERR, District Judge.

The above-entitled matter having come on regularly for hearing before the Court on defendants Anthony Ray Jefferson's and Roosevelt Jefferson's motions to suppress evidence; plaintiff appearing by and through its attorneys, Richard A. Stacy, United States Attorney for the District of Wyoming and Maynard D. Grant, Special Assistant United States Attorney for the District of Wyoming; defendant Anthony Jefferson appearing by and through his attorney, Daniel G. Blythe; defendant Roosevelt Jefferson, Jr. appearing by and through his attorney, Robert W. Schrader; and the Court having heard the arguments of counsel and the testimony of the witnesses and having fully and carefully reviewed and considered the motions and all matters pertinent thereto, and being fully advised in the premises, FINDS:

At approximately 3:20 a.m. on April 9, 1989, officer Victor Matoon of the Evanston Police Department, while monitoring traffic from the median along Interstate 80 near Evanston, Wyoming, observed a vehicle with only one operative headlight traveling east. Matoon left the median and followed the vehicle, a 1976 Oldsmobile Ninety-eight, for a short distance. During this time, Matoon witnessed the vehicle weaving back and forth within its lane of traffic. To ascertain the reason for this erratic driving as well as to inform the driver about the headlight, Matoon pulled the suspect vehicle over.

Since a third person had become visible in the car, Matoon waited for assistance before initiating an encounter with the occupants. Shortly, officer Michael Cole of the Evanston Police Department arrived at the scene. Matoon proceeded to the driver's side of the Oldsmobile, informed the driver, defendant Roosevelt Jefferson (R. Jefferson), of the reasons for the stop and asked to see his driver's license and vehicle registration papers. R. Jefferson told the officer that his license had been suspended in Colorado and that he had no registration papers. Matoon escorted him to his patrol car where Cole obtained some personal information in order to verify the status of the driver's license. When Matoon asked about the circumstances of their travel, R. Jefferson explained that he and his passengers were returning to Denver, Colorado after having towed a house trailer from Denver to California.

Matoon then returned to the Oldsmobile and, in order to determine whether a legal driver was available, asked the front seat passenger, defendant Anthony Jefferson (A. Jefferson), if he had a valid driver's license. A. Jefferson produced a valid Colorado driver's license. The passenger in the back seat, defendant Ernest Tillis, produced an identification card. Matoon asked them about the nature of their trip. A. Jefferson responded that they had been to California to visit his sick girlfriend; Tillis indicated he was just getting a ride from California to Denver. By this time, Cole had verified that R. Jefferson's driver's license was suspended and, in fact, had since expired. A citation was issued.

Matoon felt something was wrong. He had heard inconsistent versions regarding the nature of defendants' trip and R. Jefferson, with citation in hand, was suspiciously nervous. Matoon asked R. Jefferson for permission to search the Oldsmobile. According to the officer, R. Jefferson responded, "Go ahead." Matoon explained he wanted to check for the presence of illegal narcotics, weapons, or large sums of money. Before the search began, Matoon produced and read to R. Jefferson a voluntary consent to search form which R. Jef-

ferson signed after indicating he had understood what Matoon had read.

Thereafter, Matoon returned to the Oldsmobile and asked the other occupants to exit the vehicle and join Cole and R. Jefferson at the side of the highway. In the front passenger seat area was a partially burnt cigarette Matoon believed to be marijuana. He came across a zippered pouch-type compartment built into the back of the seat. When he unzipped the pouch, three marijuana cigarettes and two baggies containing what appeared to be marijuana were exposed. At this point the three defendants were instructed to lie on the ground and additional backup was summoned.

Matoon then removed the car keys from the ignition and opened the trunk. When additional law enforcement officers arrived, Matoon resumed his search of the passenger area while Cole searched the trunk. Inside the trunk Cole saw a McDonald's hamburger bag which, when opened, was found to contain eight ounces of crack cocaine.[1]

The Jefferson defendants seek suppression[2] of the narcotics seized for numerous reasons. They claim the consent was invalid because allegedly: (1) Matoon was aware that Tillis was, in fact, the owner of the Oldsmobile at the time he asked R. Jefferson for permission to search; (2) R. Jefferson had advised Matoon he was not the vehicle's owner; (3) the "consent" came only after Matoon told R. Jefferson that "they could search the car now or they could search it later"; (4) the vehicle was actually searched prior to obtaining R. Jefferson's signature on the consent form; (5) defendants were given the impression they would be arrested and taken to jail in which case the vehicle would be searched eventually anyway; (6) A. Jefferson gave no consent and thus, had an expectation of privacy; (7) the coercive circumstances at the time of the request, to-wit: the weather, the time of morning, and the scenario of one black man in the company of two armed police officers on a stretch of interstate highway left no alternative but acquiescence; and (8) any consent was made without knowledge of the right to refuse consent. Furthermore, defendants urge that there was no probable cause for the search request in the first place. Defendants maintain they have standing to seek suppression of the crack and other narcotics seized because they are both charged with a possessory crime.

■ The Government argues against standing, maintaining that the "automatic standing" doctrine enunciated in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), is no longer in effect as per *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). As the Government sees it, neither R. Jefferson nor A. Jefferson had a legitimate expectation of privacy in the McDonald's bag to confer standing to bring a suppression motion. Apart from the standing issue, the Government's position is that the search followed a valid consent which R. Jefferson had authority to give.

The Fourth Amendment to the Constitution provides that

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

---

**1.** This case represents the first federal prosecution in this district for possession of crack cocaine, a fiercely addictive drug which has been described as "an illicit bonanza for those who sell it and a curse on those who use it." Morganthau, Children of the Underclass, Newsweek, Sept. 11, 1989, at 16, 18. Particularly tragic is the impact of this drug on children and the unborn:

> [C]rack is a catastrophe for the young. It has touched off an explosive increase in birth defects and an epidemic of child abuse and parental neglect. Its profits, in neighborhoods where the standard of living is very low, have led or forced thousands of inner-city youngsters into hard-core crime, and many others into addictions from which they may never recover. It has bankrupted parental authority and it is destroying the fraying social fabric of inner-city neighborhoods all over the United States.

*Id.* at 18.

**2.** Under terms of a plea agreement, Ernest Tillis pled guilty to possession of crack cocaine with intent to distribute and, thus, is not a party to the pending motions.

Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The rights conferred by the Fourth Amendment and made applicable to the states through the Fourteenth Amendment are "personal rights which ... may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966–967, 22 L.Ed.2d 176 (1969), *reh'g denied*, 394 U.S. 939, 89 S.Ct. 1177, 22 L.Ed.2d 475 (1969). Accordingly, the exclusionary rule, which ensures the continued vitality of these personal rights through exclusion of any evidence obtained in contravention to the Fourth Amendment, protects only those individuals whose Fourth Amendment rights have been violated. If the extent of a person's aggrievement is limited to the damaging nature of the evidence seized from the search of a third party's property, he cannot benefit from the Fourth Amendment protections. Put simply, one defendant may not seek suppression of evidence by asserting the Fourth Amendment rights of another defendant.

In *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the Supreme Court developed the concept of "automatic standing," that is, that one accused, as here, of a possessory crime can challenge the validity of a search which led to the seizure of evidence to be used against him without regard to whether or not he had a legitimate expectation of privacy in the premises searched or an ownership interest in the property seized. The reasons behind the adoption of this rule stemmed in part from the untenable position a defendant had been put in prior to *Jones* whereby his admission at a suppression hearing to a possessory interest in items seized essentially became an incriminating statement which was admissible at his subsequent trial. *Id.* at 262, 80 S.Ct. at 731–732. Also, the Court was concerned with the contradictory benefits the Government would derive absent "automatic standing," namely that it could secure a conviction based on possession of the seized items at the time of the search, while these items were allowed into evidence on the ground that the defendant did not have a possessory interest in the items for purposes of suppression. *Id.* at 263, 80 S.Ct. at 732. The Court concluded that with its standing rule, "anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him." *Id.* at 267, 80 S.Ct. at 734.

Not long after *Jones*, the Court resolved one of the factors which influenced its decision in *Jones* by holding that a defendant's testimony at a suppression hearing could not be used against him at trial unless the defendant raised no objection. *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968). And so began the gradual erosion of the underlying concerns which the Court felt necessitated its holding in *Jones*.

The next challenge to *Jones* came in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), *reh'g denied*, 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979), an automobile search case involving the seizure of a sawed-off rifle and shells. Those challenging the legality of the search and seizure were passengers who, in addition to not owning or leasing the automobile, at no time came forward to claim an ownership interest in the items seized. Citing the "legitimately on premises" language of *Jones*, petitioners asserted standing for suppression purposes. Giving this aspect of *Jones* narrowly restrictive application, the Court expressed its disapproval of the doctrine by describing it as one "which at most has superficial clarity and which conceals underneath that thin veneer all of the problems of line drawing which must be faced in any conscientious effort to apply the Fourth Amendment." *Rakas*, 439 U.S. at 147, 99 S.Ct. at 432. Rather, the Court focused on such considerations as "dominion and control" and ability "to exclude all others" as influential factors on the issue of legitimate expectation of privacy. *Id.* at 149, 99 S.Ct. at 433. It concluded that the passengers were unable to

show either of the aforementioned factors with respect to the areas of the automobile which were searched and from which any incriminating evidence was seized, *id.*, and thus did not have a legitimate expectation of privacy such as would enable them to seek suppression of any items seized.

Not long after its ruling in *Rakas*, the Court, in a 7–2 decision, sounded the death knell for the *Jones* "automatic standing" rule, essentially finding that the rule had "outlived its usefulness" in light of *Simmons* and *Rakas*. *United States v. Salvucci*, 448 U.S. 83, 95, 100 S.Ct. 2547, 2554–2555, 65 L.Ed.2d 619 (1980). The Court reiterated its unwillingness to equate legal possession of a seized good with a legitimate expectation of privacy. *Id.* at 91, 92, 100 S.Ct. at 2552, 2553. This left defendants seeking to challenge the admissibility of seized evidence with the threshold burden of demonstrating a legitimate expectation of privacy in both the areas searched and in the items seized. *See id.* at 95, 100 S.Ct. at 2554–2555.

The inquiry, thus, properly turns to a consideration of whether R. Jefferson and A. Jefferson had a legitimate expectation of privacy in the Oldsmobile and the narcotics, particularly the crack, seized. Subsumed within that inquiry is the issue of whether their challenge, coming as it does when the owner of the car was also present as a passenger, comes within the protective umbrella of the Fourth Amendment. As the Court did in *Rakas*, this Court, rather than dealing with standing as though it was somehow divorced from fundamental Fourth Amendment jurisprudence, prefers to review suppression cases from the standpoint of whether the persons challenging the search and seizure come within the class for whose protection the Fourth Amendment was designed. Such an approach recognizes that standing is an inescapable consideration in the overall Fourth Amendment analysis.

One of the bases for their suppression motions is the belief that the officer who sought permission to search the vehicle from R. Jefferson did so at a time when he knew or should have known that the vehicle's owner, Tillis, was present. According to officer Matoon's testimony, which suffers from no lack of credibility, at the time he was seeking an explanation from A. Jefferson and Tillis regarding their trip, Tillis never indicated he was the owner of the vehicle. Likewise, R. Jefferson gave no indication that he was not the owner of the vehicle.[3] Under cross-examination, Matoon testified that since the vehicle bore temporary license tags, a registration check could not be accomplished through the FBI's National Crime Information Center computer network.

The Court has reviewed the caselaw which confers upon a defendant a legitimate expectation of privacy where he is able to show that the owner of a vehicle granted him permission to use the vehicle. These cases are unpersuasive in this context; for, unlike the situation which existed in those cases, here the vehicle's owner was present as a passenger at the time of the stop. Moreover, the evidence showed that the Jeffersons alternated driving the vehicle.

The Jefferson defendants have not asserted a possessory interest in either the Oldsmobile or the McDonald's bag containing the crack. They do not and could not claim a legitimate expectation of privacy in the McDonald's bag. Under these circumstances, the rights and protections secured by the Fourth Amendment and the exclusionary rule are by no stretch of the imagination theirs to claim. The extent of their concern is with the damage this evidence will bring to them at trial. That concern lies outside the purview of the Fourth Amendment. Because R. Jefferson and A. Jefferson had no Fourth Amendment right to vindicate, their motions to suppress are for naught.

---

**3.** Matoon did testify that R. Jefferson made some mention early on that the vehicle belonged to "Shorty." Only later, incident to the booking process, did Matoon learn that "Shorty" was Tillis' nickname. At no time during Matoon's obtention of consent from R. Jefferson or, for that matter, during the course of the search did Tillis object or give any indication that he was the owner of the vehicle.

Since the Court today holds that R. Jefferson and A. Jefferson have failed to surmount the threshold burden of demonstrating a legitimate expectation of privacy so as to entitle them to challenge the legality of the sequence of events which led to the seizure of the crack as well as the seizure itself, the issue of consent need not be addressed in any substantive detail.

Society pays a high price for the vindication of Fourth Amendment rights. Items which very often form a necessary, if not the only, link between a defendant and the crime he is charged with are never brought before a jury due to police misconduct associated with the search and any subsequent seizure. Suffice it to say that after reading the briefs and hearing the witnesses testify, the Court is convinced that the actions of the principal police officers involved during all relevant periods, as more fully developed above, at no time rose to the level of misconduct. On the contrary, officer Matoon's actions leading up to, during, and after the search and subsequent seizure demonstrate behavior consistent with a good faith attempt to perform his duty within the parameters of the law.

NOW, THEREFORE, IT IS

ORDERED that defendants Anthony Ray Jefferson's and Roosevelt Jefferson, Jr.'s motions to suppress evidence be, and the same are, hereby denied.